THE PROVIDENCE & STONINGTON STEAMSHIP COMPANY, PLAINTIFF, *v.* THE PHŒNIX INSURANCE COMPANY, AND THIRTEEN INSURANCE COMPANIES, DEFENDANTS.

*Policy of marine insurance—when the underwriter must contribute to the expense of getting off a stranded vessel—how his proportion of the expense is determined.*

The defendant issued a policy of marine insurance upon a steamer belonging to the plaintiff, which contained the following clause: "It is understood that this policy covers all perils of the sea and navigation usually taken by marine underwriters, loss by fire excepted." While the policy was in force the steamer went ashore in a storm, and was in danger of becoming a total wreck, the officers and crew being unable to get her off. Thereupon the plaintiff, having been told by the defendant to act as though the steamer

was uninsured, employed a wrecking company, which succeeded in saving her.

*Held,* that the defendant was, under its policy, bound to contribute its just and fair proportion of the expenses incurred in so saving the steamer.

The value of the steamer, as stated in the policy, was $75,000. Upon a general average adjustment the contributory value of the steamer was stated at $275,000.

*Held,* that the defendant was only bound to contribute such a proportion of the total expenses as the value of the steamer, as fixed in the policy, bore to its value as stated in the general average adjustment.

CONTROVERSY submitted to the General Term upon agreed facts, under section 1279 of the Code of Civil Procedure.

The plaintiff's steamer *Massachusetts,* from New York bound for Providence, went ashore, in a violent storm, at Rocky Point, Long Island Sound, on the night of October 4, 1877, and, the efforts of the officers and crew to get her off being unsuccessful, she was in danger of becoming a total wreck. Each of the insurance companies above named, except the Phenix, had a policy upon the steamer for $5,000. The Phenix Insurance Company had a policy of $10,000.

On receipt of the news of the disaster in New York, the president of the Providence & Stonington Steamship Company, owners of the steamer, called a meeting, which meeting was attended by the representatives of all the companies, and at which meeting the latter told the president of the steamship company to act as though the steamer was uninsured. The president of the steamship company thereupon instructed Captain Merritt of the Coast Wrecking Company, who was present at the meeting, to use every effort to save the vessel. The efforts made to save the steamer were successful, and on October 19, 1877, she reached New York and was docked for repairs. The insurance companies, after making an examination, offered to pay the sum of $46,000 to cover the expenses of repairing the steamer. That offer was accepted by the owners, and that amount was paid. Subsequent to the payment of the $46,000, the Coast Wrecking Company rendered a bill of $35,000 for their services in saving the steamer. The bill was deemed excessive both by the insurance companies and by the owners of the steamer. After consultations with the insurance

companies, the president of the steamship company made a settlement with the Coast Wrecking Company and paid them, with the assent of the insurance companies, in full settlement, the sum of $17,500 (and in addition thereto, paid other sums necessarily expended in saving the steamer, amounting to $4,340, making the total expenditure $21,840).

On December 15, 1877, a statement of general average was made by Messrs. Johnson & Higgins, in which the contributory value of the *Massachusetts* was stated at $275,000, which was the fair value thereof.

It is claimed by the owners of the steamer that, under the policy, the insurance companies should pay to them, in addition to the $46,000 paid for repairing the steamer, the further sum of $21,840 (cost of saving the steamer), in the proportion of $1,456 on every policy of $5,000.

It is claimed by the insurance companies : First, that having paid $46,000 to cover expenses of repairing the steamer, they are not liable for the payment of any further sum whatever ; and, second, that if liable to pay any proportion of the said sum of $21,840, they are liable to pay such proportion thereof as the value of the said steamer, as stated in the said policy, bears to the value of said steamer, as stated in the said adjustment of general average, or that, on each policy of $5,000, there is to be paid the sum of $397.09.

The questions submitted to the court were :

*First*—Are the insurance companies, having paid $46,000, to cover the cost of repairs to the steamer, bound to pay anything more ? and

*Second*—If the insurance companies are liable, what amount are they bound to pay ?

By the policy, " The Phenix Insurance Company of Brooklyn, N. Y., in consideration of the sum of two hundred dollars, do insure the Providence & Stonington Steamship Company for account of whom it may concern ; loss, if any, payable to the treasurer, $10,000 on the steamer *Massachusetts*, her hull, engines   .   .   . for the term of six months from May 4, 1877, to November 4,

1877, said steamer being, for the purposes of this insurance, valued at $75,000.

"It is understood that this policy covers all perils of the sea and navigation usually taken by marine underwriters, loss by fire excepted, but that no thirds are to be deducted in case of partial loss. It is further understood that this company shall not be liable for damage to boilers or machinery unless caused by stranding, sinking or collision.

"No contribution shall be claimed under this policy for any damage not exceeding the sum of five hundred dollars.

"In case of loss, payment under this policy to be made within thirty days after proof of same."

*John K. Porter* and *W. P. Dixon*, for the plaintiff.

*Wheeler H. Peckham* and *Butler, Stillman & Hubbard*, for the defendants.

BARRETT, J.:

The first question presented by this agreed case is whether the insurance companies are liable at all, for the expenses incurred in saving the plaintiff's steamer. The defendants admit (and have settled) their liability for the repairs, but insist that the expense of getting the steamer off the point where she was stranded is not within the terms of the policy. If this were a marine policy, with the usual "sue and labor" clause, and the expression "free from average unless general," it is not doubted that the underwriters would be bound to contribute. "A stranded vessel" says Benecke, "is in most cases in danger of being lost unless speedy measures be taken for her preservation"—precisely this case. "These measures," he adds, "are general average so far as they serve to avert a danger threatening the whole concern. The charges thereupon of heaving the vessel off without discharging her are general average." (2 Phillips on Marine Insurance, § 1340.) This is upon the principle that parties having a common interest in property shall sustain a fair proportion of a sacrifice made, or expenses incurred in relation to it for the common benefit. The case of *Aitchison* v. *Lohre* (Law Rep., 4 Appeal Cas., 755) does not disturb this well-

settled principle. A distinction was there drawn between salvage and ordinary expenses. It was held that the former was not within the " sue and labor " clause. But Lord BLACKBURN took pains to limit this rule to salvage, and to exclude ordinary expenses from its operation. "In some cases," he observes, "the agents of the assured hire persons to render services on the terms that they shall be paid for their work and labor, and thus obviate the necessity of incurring the much heavier charge which would be incurred if the same services were rendered by salvors who are to be paid nothing in case of failure, and a large remuneration, proportional to the value of what is saved, in the event of success. I do not say that such hire may not come within the suing and laboring clause." The defendants in the present case, however, are fire insurance companies authorized to take certain marine risks. Their policies are not in the ordinary form in use by marine insurance companies. For instance, the " sue and labor " clause has not, in so many words, been embodied therein ; nor has the expression " free from average unless general." The insurer's liability is, in fact, wholly governed by the following language : " It is understood that this policy covers all perils of the sea and navigation usually taken by marine underwriters, loss by fire excepted." The defendants contend for a literal construction of this clause. The stranding, they concede, was a peril of the sea. That necessitated repairs for which they were liable and for which they have paid. The getting the steamer off, however, was *to avoid further peril. Ergo,* the expense did not directly result from a peril of the sea or of navigation. This is altogether too narrow a view of the obligation. Even an ambiguous policy of insurance is to be construed liberally in favor of the insured. (*Rolker* v. *Great Western Ins. Co.,* 3 Keyes, 17.) But these policies were clearly intended to indemnify the plaintiff in case of loss to the same extent as though issued in the ordinary form by marine insurance companies. With the latter, these defendants were attempting to compete. It is not likely, then, that they held out inferior inducements. Both parties, therefore, undoubtedly understood that the language employed was a short way of engrafting upon the contract the usual provisions of a marine policy. If, in consequence of the phraseology used, the " sue and labor " clause is deemed to be

excluded—why not also the expression "free from average unless general"? And as the liability to contribute to general average depends upon the construction which gives the latter phrase the effect of an affirmative covenant, what then becomes of that liability? In our judgment the word "perils" was plainly used in the sense of "risks." Otherwise the phrase is awkward. "Marine underwriters" do not "usually" *take perils* of the sea and navigation. They take marine risks. The acts of the parties, too, favor this construction. It appears that on receipt of the news of the disaster in New York, the plaintiff's president called a meeting, which was attended by the representatives of all the companies, at which meeting the latter told him to act as though the steamer was uninsured. Thereupon the president instructed Captain Merritt, of the Coast Wrecking Company, who was present, to use every effort to save the vessel. We cannot agree to the paraphrase put upon this by the learned counsel for the defendants. It was by no means equivalent to saying "we (insurance companies) will have nothing to do with it; you (ship owners) must take your own course and leave questions of liability to be settled afterwards." The meeting could have been called for no other purpose than to secure the defendant's consent to the employment of the special and somewhat expensive means involved in the efforts of the Coast Wrecking Company. The unaided efforts of the officers and crew had been unsuccessful, and the steamer was in danger of becoming a total wreck. The defendants were, of course, deeply interested in the fate of the vessel, and in the extraordinary measures proposed and directed by the plaintiffs. Considering the situation of affairs, the only reasonable characterization of what took place at the meeting is, that the defendants assented to the employment of the Coast Wrecking Company with the understanding that they would contribute their fair and just proportion of the expenses. We therefore answer the first question submitted to us in the affirmative.

The second question is, as to the amount which the companies are bound to pay. Upon a general average adjustment, the contributory value of the steamer was stated at $275,000, "which," says the submission, "was the fair value thereof." The value, as

stated in the policies, was $75,000. The plaintiffs claim that the defendants are bound to contribute the entire amount which, upon the valuation of $275,000, was charged upon the steamer. The defendants insist that they are bound to contribute only such proportion of that amount as the value fixed in the policies bears to the value as stated in the general average adjustment. We are persuaded that the defendants are right in this contention. The fallacy of the plaintiff's position with regard to it consists in treating the expenditure in question as damages resulting directly from the perils insured against. They thus put this expenditure upon precisely the same footing as that incurred for the repairs necessitated by the accident; and, upon the same principle, claim full indemnity therefor. This is an erroneous view of the underwriter's engagement. Primarily he agrees to pay for the loss of the thing insured, or some part of it. That, of course, would cover the repairs. There, however, the liability would stop, but for the "sue and labor" clause, and the contract to pay general average. The latter engagements are entirely distinct from the direct liability for damages occasioned by the perils insured against. They are simply undertakings to contribute—that is, to bear a due proportion of the expense. If a loss is averted by the services of the assured and his servants, or of others hired by them, "the underwriters are liable," says Lowndes, "under the sue and labor clause, *not as part of the sum insured,* but as a contribution made by them as persons who have avoided detriment by the result." It is clear, then, that the defendants are only bound to contribute to the expense incurred in getting the steamer off. It is equally clear that their contribution should be proportionate to the value of the steamer, as fixed in the policy. The learned counsel for the plaintiffs devote a large part of their able brief to an elucidation of the principle that, as between insurers and insured, a valued policy is to be taken as fixing the true value of the subject insured. This is, indeed, well settled, and hardly needed a citation of the numerous authorities in this country and in England. It is this very rule which the defendants invoke and rely upon. Under it they deny their liability to contribute upon a greater valuation than that fixed in the policies. And in this they are correct. The truth is that the plaintiffs were their-

own insurers to the extent of $200,000. Upon that amount they are bound to contribute. This is so as to contributions in general average. " The underwriters, " says Arnould (vol. 2, p. 950), " are not bound to reimburse the insured the full amount of his contribution, but only that proportion of it which the value of his interest as insured bears to its value as estimated for the purposes of contribution." The same is true of contribution under the " sue and labor " clause. " An underwriter's liability," says Lowndes, " whether for general average or under the 'sue and labor' clause, is a liability not absolutely to pay the whole, but to contribute. If, therefore, that which is really saved by the sacrifice or expenditure is something more than the policy value of the thing insured, the expense must be divided ratably between the value saved to the insurer and the value saved to the assured, or to some third party. If, for example, a cargo which is valued in the policy at £5,000 is saved by this means, and if the real value of that cargo in the market is £6,000, the insurer is only liable to pay five-sixths of the general average or expense. The owner of the goods, who has derived benefit from the saving of the property to the extent of one-sixth over and above the amount covered by insurance, must bear one sixth of the ransom." (Lowndes Law of Average, 3 ed., 243. See also, 2 Pars. on Ins., 348; 3 Kent Comm., 274; *Hotchkiss* v. *Insurance Co.*, 1 Robt., 499; *Clark* v. *Insurance Co.*, 7 Mass., 365; *Welles* v. *Insurance Co.*, 6 Pick., 182.) It is true, as urged by the plaintiffs, that the liability attaches even when there is no cargo to contribute. It is sufficient that the sacrifices *are in the nature* of general average. But even in that case underwriters are liable for the expenses only " *in the proportion* in which the value of the ship is insured by the policy." (2 Phillips on Ins., § 1412; *Potter* v. *Ocean Ins. Co.*, 3 Sumn., 37.) As Judge STORY observed in the latter case, " If the plaintiff was not fully insured, he must contribute his proportion towards the common expenditure." And this is manifestly just. The plaintiffs emphasize the fact that, but for the rescue of the steamer, there would have been a total loss. That is true. It is equally true that such total loss would have cost the insurance companies full $75,000. But would it not also have cost the plaintiffs the full uninsured $200,000?

With what show of justice then, can they claim to be relieved of every part of the burden of rescue? Both upon principle and authority, we are of opinion that this burden should be shared by the parties, in proportion to their respective interests. That is our answer to the second question.

Judgment accordingly for the plaintiffs, for the respective amounts due to them, under the conclusions of this opinion, with costs.

Davis, P. J., and Daniels, J., concurred.

Judgment ordered for plaintiffs, with costs, for the amount indicated in the opinion.